We will begin, I'm told that, sorry I'm told that all council are present so we'll dispense with the calling of the day calendar and begin with the argument in United States v. Walsh. Good morning, your honors, may it please the court, my name is Nathaniel Marmer and I represent Mr. Walsh on this bail application. Your honor, there's no question that Mr. Walsh is neither a flight risk nor a danger to the community. The question for this panel is whether there's a substantial question of law that may result in either reversal or a vacator of the conviction. I'd like to begin, if I may, with the Brady issue, and in particular, the two questions that this court left open in the Rodriguez case, which are particularly apt here and present that substantial question of law that may result in a merits panel giving a remedy to Mr. Walsh. One is whether the 40 to 50 interviews of the key witness in this case should have either been recorded or somehow memorialized in order to, as this court said, to ensure that any Brady material can be adequately relayed to the defense. The second question is what happens if the government instructs an agent not to take notes in order to avoid its Brady and Giglio obligations. Here, the main issue in this case, at least the main disputed issue in this case, was what was the discretion that Edward Walsh had to do part of his job outside of the jails. The government concedes that he spent several hours every day at the jails, but there's a dispute as to whether he could have done a lot of his work outside the jails. And there was certainly abundant evidence to that effect. There were thousands of phone calls. There was evidence that the under-sheriff to Sheriff DeMarco had said he was always available, he did his job. There were plenty of witnesses who testified that Walsh did all sorts of official activities, including going to wakes, graduations, trainings outside of the office. But there was one witness, and the key witness in this case was Sheriff DeMarco, who said, no, I never gave him that authority. And that was the key issue in this case. And what is astounding is that Sheriff DeMarco was interviewed 40 to 50 times without a single note being taken. And in several ways, that goes far beyond what happened in Rodriguez, where Judge LaValle made those two observations about the day may come when we have to do something different. Today is that day. Well, what you'd be asking for in the first instance, I suppose, is a hearing to determine the facts, right? Because what we've got here is a somewhat unclear record as to things like what constituted interviews, how many times was he talked to, with what content, about what. And was it the case that anyone instructed the agent not to take notes in those interviews, right? I do think that a merits panel may find that a hearing would be the most appropriate remedy here. I don't know that that's the only remedy, but taking your question, that is a fair point. And here, there was a dispute that the government raised about the number of interviews, but I think we had it better, as you see in our reply brief, not only the context of the questions leading up to this. Well, we spoke 40 or 50 times, but then later, the specific question that says in your 40 plus interviews. So the record fully establishes that, or at least- It's also a question of characterization. I mean, is it an interview if you go and, if you call him up on the phone and say, well, what about this little fact? And he says- Fair enough. I think I was just trying to make the point- I understand. That it's at least a factual question that we have more than come forward with evidence that there were potentially interviews. I also point out that Agent Hosey, when discussing interviews or discussions with other witnesses, did make clear at one point, he said, oh, let me clarify, that was just sort of a hallway discussion. So when he says interviews, I think the implication, and I think it's a strong implication, he never denied it, was to say, these were interviews. And taking that at face value, or at least that we've established that there's a factual premise for our argument. That's an incredible number of interviews. I think anybody would be surprised, unless you're being waterboarded, 40 to 50 interviews is something that's unnecessary for a non-cooperator. Somebody who is a sheriff of a populous county, who presumably has other things to do. And then we learn other things along the way. We learn, one, that an important piece of what I would call Brady material didn't get disclosed, which is that DeMarco spoke to his undersheriffs, who in effect said, look, in those three years and before, he was always available. We reached him by phone. He was always doing his job. Not a single problem. That we can dispute what the significance is of that, I suppose. But that is pretty strong evidence that should have been disclosed. That was never disclosed. I see that my time is almost up, but just to make the point. You know, I just wanted to, you know, the real question I think is here, is how do you distinguish Rodriguez, or how do you fit into the facts that Rodriguez left open? We make those points, I think, quite strong in our brief, that there's a number of distinctions. And look, the proof is in the pudding. When you're interviewing someone 40 to 50 times, what happened the first time? What happened the second time? What happened the third? Is he telling the same story? It's inconceivable that he's telling that same story over and over and over again. Because if he were, you would not need to interview him. And if he wasn't, which is certainly the strong inference, that should have been disclosed. He was the main witness in the case. Judge Spatz said he was the only witness who testified that Walsh had to be at the office. There was plenty of evidence that would support our theory to the contrary. But having that witness, the sheriff of the county, make that statement in an effectively unimpeachable way was devastating to the defense. Thank you. Thank you, Mr. Marmer. Thank you. Morning, your honors. May it please the court. I'm just going to address the issue of the alleged Brady. And I think at the outset, I just want to set what actually happened. And with regard to these 40 or 50 interviews, subsequent to the trial, during the trial there was cross-examination. And he said he spoke to the sheriff 40 or 50 times. And then during cross-examination, he adopted a question where it says, during these 40 or 50 interviews, did you ask him X? And he said no. But there was a post-trial Fatico hearing in which it specifically indicated on the record that he spoke to him 40 or 50 times. So there was no interviews, and I'll tell you why. This case- There were no interviews? Well, he did speak with him, but it's sort of a different case, because what happened here is Ed Walsh was the leader of the conservative party. He wielded both actually and perceptively a lot of power within that agency. When it came to the sheriff's attention that he might not have been showing up for the trial, he tried to investigate Walsh, he tried to get a subpoena from the district attorney, district attorney refused. He tried to get a subpoena from the county attorney, the county attorney refused. And then he went to the US Attorney's Office, and the case was referred to the FBI, and then the investigation began from there. And Agent Sahozy testified that his general policy was that normally, when you're dealing with other agencies and other investigators, he doesn't take notes of conversations he has with regard to logistics and other things. And it should be noted that we did provide 3,500 material from Sheriff DeMarco with regard to the steps that he took when he was investigating the case. In other words, when he went to the district attorney's office and was turned down. When he- Mr. Chairman, I just want to make sure I'm clear. So none of the 40 to 50 times that the agent met with him, none of them were interviews? It wasn't interviews in the sense of a traditional witness interview. What happened was DeMarco investigated it, couldn't get any traction with the local authorities. Then went to the federal authorities and basically said, this is what I have. And he gave him the notes, which were turned over 3,500, and they discussed the case. But at least Agent Hosey viewed it as two investigative agencies speaking with one another. And the policy, and I think it's quite common, that when that happens, investigative agencies don't write 3,500. You're saying this is more like what happens when an FBI agent is working on a joint investigation with the police. And the police come up with some facts and relay them to the lead agent. Or even as if he were talking to other FBI agents working on the case. And one of them develops some information and relays it to the lead agent. Is that, that's kind of the model you're- Yes. Positing? It's not showing up in a 302. Yes. Are there any other questions? That's the linchpin as I understand it. Okay, and just with regard to the, no one, there were no witnesses that said that he was permitted to work outside the jail. In fact, both the prosecution witnesses as well as defense witnesses were asked, and they said, we have no reason for this defendant to have worked outside the jail. He works inside a jail, pursuant to the collective bargaining agreement, he is required to be there. He's required to work the regular and overtime hours that he puts down in his time sheet that he's getting paid for. And there was literally a mountain of evidence, including both billing and cell site records, casino records, conservative party records. That this defendant, while he was claimed to have been working, was out of the jail doing personal business. Is it clear in the trial record that, or is there anything in the trial record we could look at that indicates that the sheriff commenced this investigation and referred it to the FBI? Absolutely. His testimony begins sort of chronologically, and it starts with the media. So what happens is there is a shareholder meeting, and Ed Walsh attends that shareholder meeting. And then the local publication, Newsday, makes a Freedom of Information Act and says, we want to see his time sheets. So they get his time sheets, DeMarco realizes they have a problem, he shows it to Walsh, Walsh says it's fine. And then the investigation begins, and what he wants to do now is he learns that he's golfing, and then he tries to get subpoenas from the various state agencies, and he can't do so. And it starts, the advent of the investigation starts out in the beginning of Sheriff DeMarco's testimony. There being no questions, thank you. Thank you both. Helpful arguments. We'll reserve. Can you respond on just a record point? Sure. I don't mean to belabor this, but I don't think the record shows that substantive material was turned over in the sense of police or other agencies taking notes that were then the equivalent of what a federal agent would have taken. The record is very clear that he met with Hosey or was interviewed. I think what the government is suggesting is they turned over notes of the sheriffs, of DeMarco's. Testifying witness. There was, in my understanding, what happened was DeMarco tried to shop this to other agencies who said no. But the notion that- Other agencies that are arguably under the political influence of Walsh. That may be true, but the fact is that there were no substantive statements of DeMarco that were able to be used to impeach him on the question. If the idea is that DeMarco allowed all of this, the fact that he begins the investigation because he thinks there's something wrong. And as you put it, shops it to a series of investigative agencies that don't take him up on it. Tends to undercut the theory that the sheriff had all along said it was okay. And then other people somehow ginned up this investigation. And they used that to their advantage. But it was very difficult to undermine that without knowing specifically why they had met so many times and what was changing during the course of those interviews. Thank you, Mr. Marmer. We'll reserve decision, but we'll get you one very shortly.